Rockingham
No. 7635

STATE OF NEW HAMPSHIRE

v.

DANIEL MCCARTHY & a.

October 24, 1977

*David H. Souter,* attorney general, and *John L. Ahlgren,* assistant attorney general *(Mr. Ahlgren* orally), for the state.

*Shaw & Robinson,* of Exeter, and *Norman C. Gile (Mr. Gile* orally), for the defendants.

GRIMES, J.   The issue in this case is whether the land of the defendants which is adjacent to tidal water and which was filled by them is within the control of the state under RSA 483-A: 1-a I (Supp. 1975). We hold that it is not. The constitutionality of the statute is not raised in this case. *See Sibson v. State,* 115 N.H. 124, 336 A.2d 239 (1975).

The defendants are owners of land on Ocean Boulevard in Hampton adjacent to tidal waters. The state, in October 1974, filed a petition seeking to compel the defendants to remove certain fill alleged to have been placed by them in violation of RSA 483-A: 1 (Supp. 1975). The matter was referred to a Master *(Leonard C. Hardwick,* Esq.) who found in favor of the state. His report was approved, and a decree in accordance with it was entered by *Perkins,* J., who transferred defendants' exceptions.

The lands to which RSA ch. 483-A (Supp. 1975) apply are defined in section 1-a which reads as follows:

> Definition. Without limiting section 1, the waters and adjacent areas within this state to which this chapter applies are defined as follows:
>
> I. Wherever the tide ebbs and flows, it shall apply to all lands submerged or flowed by mean high tide as locally determined, and, in addition, to those areas which border on tidal waters, such as, but not limited to banks, bogs, salt marsh, swamps, meadows, flats or other lowlands subject to tidal action (including those areas now or formerly connected to tidal waters), whose surface is at an elevation not exceeding three and one-half feet above local mean high tide and upon which grow or are capable of growing some, but not necessarily all, of the following: Salt meadow grass. . . . The occurrence and extent of saltmarsh peat at the undisturbed surface shall be evidence of the extent of jurisdiction hereunder within a saltmarsh.

This section embraces two kinds of land which are included in the definition.

1. [A]ll lands submerged or flowed by mean high tide . . .

2. [land bordering tidal water subject to tidal action] "whose surface is at an elevation not exceeding three and one-half feet above mean high tide and upon which grow or are capable of growing some" of the vegetation specified.

It is agreed that the land in question is not submerged or flowed by mean tide even though the master found in the alternative that it was; so jurisdiction over it could not be based on that part of the definition. To meet the definition of the second type of land, three requirements must be met; *i.e.*, the land must be bordering tidal water and be subject to tidal action, its surface must be at an elevation not exceeding three and one-half feet above mean high tide, and some of the specified vegetation must grow or be capable of growing. The master found the first two requirements but denied two separate requests of the state that he find that the burdened land, prior to the placement of fill, grew or was capable of growing the required vegetation. The burdened land referred to in the request included the land covered by the court's decree. The denial of these requests results in a failure of the state to prove an essential element of jurisdiction under the second part of the definition and, therefore, it was error for the trial court to enter the decree it did.

The state urges us to conclude that requests 4 and 5 were denied because they related to a larger area than the decree and that from the finding of jurisdiction by the master we should imply a finding that the specified vegetation is capable of growing on that part of the land covered by the decree. We are of the opinion that if the master, who has had extensive experience, had denied requests 4 and 5 for the reason suggested, he would have made a specific finding as to the land covered by the decree. Where important rights of the defendants are involved and substantial penalties and expenses are imposed, a decree cannot be supported by speculative implications.

Although it is true, as the state contends, that this court may imply findings which are necessary to support a trial court's decree at least where no contrary findings have been made, *Household Goods Carriers v. Ouellette*, 107 N.H. 199, 201, 219 A.2d 699, 700 (1966), here we not only have an express denial of the re-

quired finding but we have two separate explanations for the decree which do not require a finding that the specified grasses did or could grow on the land covered by the decree.

The master in his report stated his understanding of the land included by RSA 483-A:1-a (Supp. 1975) as follows: "By Section 1-a of Chapter 483 waters and adjacent areas within this state to which the Chapter applies are defined to include (1) all lands submerged or flowed by mean high tide (2), areas which border on tidal waters such as salt marsh subject to tidal action (3) areas whose surface is at an elevation not exceeding three and one-half feet above mean high tide in which some of the various vegetation named in the section grow or are capable of growing." He then found that the land in question "was submerged or flowed by mean high tide or were [sic] salt marsh areas which bordered on tidal waters."

By dividing the second part of the definition into two parts the master acted on the basis that there were three types of land included instead of two. By this misconstruction of the statute the master considered "areas which border on tidal waters such as salt marsh subject to tidal action" as a separate or third category of land rather than one of the three parts of the definition of the second type of land. Under his construction of the statute the land would be subject to control if it was one of the "areas which border on tidal waters such as salt marsh subject to tidal action" even though it was more than three and one-half feet above mean high tide and even though the required grasses were not growing or were not capable of growing on it. This construction of the statute was erroneous. To give jurisdiction over land which is not covered by mean high tide, the master's second and third requirements must be combined and all three elements of the combination must exist, one of which is the requirement that the specified grasses grow or be capable of growing.

The master's erroneous alternative finding that the land was flowed by mean high tide and his erroneous ruling of law gave two distinct bases for his conclusion that there was jurisdiction without the necessity of a finding that the required grasses grew or were capable of growing. Such a finding is not therefore a necessary or permissible implication from his ultimate conclusion.

The state further argues that even if the requirements of RSA 483-A:1-a (Supp. 1975) have not been met, the master's findings do meet the requirements of RSA 483-A:1 (Supp. 1975) which is

the general prohibitive section which forbids any person from filling any bank marsh or swamp "in and adjacent to any waters of the state" without notice to the water resources board. It relies on the "without limiting section 1" provision of section 1-a (Supp. 1975).

Although it is stated that the definition of jurisdiction does not limit section 1, it does nevertheless define the reach of the chapter and the meaning of section 1 and the jurisdiction of the board must be found in section 1-a. Nor does the fact that at some times of the year the tide reaches the area filled bring it within the waters of the state, for any rights the state may have end at mean high tide.

The last sentence of section 1-a I does not automatically extend jurisdiction to all areas where salt marsh peat exists at the undisturbed surface but only makes that fact "evidence of the extent of jurisdiction." The failure of the master to find that the specified vegetation either grew or was capable of growing on the area which was the subject of the decree requires that the decree be vacated.

*Exceptions sustained; decree vacated.*

KENISON, C.J., dissented; the others concurred.